# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

THE NAVAJO NATION,

    *Plaintiff*,

v.

ALEX M. AZAR II, Secretary, United States Department of Health and Human Services,

    *Defendant.*

Civil Action No. 18-0253 (DLF)

## MEMORANDUM OPINION

Before the Court is the Plaintiff's Motion for a Preliminary Injunction. Dkt. 2. For the following reasons, the Court will deny the motion and order the parties to propose an expedited schedule for resolving this case on its merits.

## I. BACKGROUND

Under the Head Start Act, the U.S. Department of Health and Human Services ("HHS") provides grants to tribes that implement Head Start and Early Head Start programs for young children and their families. 42 U.S.C. § 9831 *et seq.*; Compl. ¶ 1, Dkt. 1. Qualified organizations can receive grants for up to 80% of Head Start program costs. 42 U.S.C. § 9835(b). The grants are administered by a division of HHS, the Administration of Children and Families ("ACF"). Compl. ¶ 2.

The plaintiff, the Navajo Nation, is a federally recognized Indian tribe whose reservation spans parts of Arizona, New Mexico, and Utah. *Id.* ¶ 11. It runs Head Start and Early Head Start programs to provide education services to its young members and residents and their families. *Id.* ¶ 1. The programs are funded primarily by an ACF-administered federal grant, No.

90C19889 ("the Grant"), which is at the center of this case. *Id.* ¶ 2; Aff. of Dr. Elvira Bitsoi ("Aff.") ¶ 3, Dkt. 3-1. The Grant's budgetary period, or fiscal year, starts on March 1 each year and runs through February of the next year. Compl. ¶ 17. The Navajo Nation must submit an annual renewal application for the Grant, which is due on December 1 before the new fiscal year starts. *Id.* ¶ 18. Pursuant to the Grant in recent fiscal years, the Navajo Nation has received $23,075,043 annually. *Id.* ¶ 3.

Under the Head Start Act, however, grants are not static from year to year. The Act provides specific procedures for adjusting grants to Head Start programs that suffer from chronic under-enrollment, as Navajo Head Start does. Grantees must self-report enrollment each month, 42 U.S.C. § 9836a(h)(2), and HHS must conduct a semiannual review to determine which grantees have been under-enrolled for four consecutive months, *id.* § 9836a(h)(3). HHS and each under-enrolled grantee must then develop a plan and timetable for reducing under-enrollment, and the grantee "shall immediately implement the plan." *Id.* § 9836a(h)(3), (4). If the grantee does not reach at least 97% enrollment within twelve months, HHS may designate the grantee as chronically under-enrolled and "recapture, withhold, or reduce" the base grant by a percentage calculated as the difference between funded and actual enrollment. *Id.* § 9836a(h)(5)(A). Also, HHS may waive or decrease the adjustment in specified circumstances. *Id.* § 9836a(h)(5)(B). If HHS adjusts funding for an Indian Head Start program, HHS must redistribute the resulting funds to other Indian Head Start programs by the end of the following fiscal year. *Id.* § 9836a(h)(6).

HHS followed these statutory procedures to adjust the Navajo Grant for fiscal year 2018, which will run from March 1, 2018 to February 28, 2019. Decl. of Angie Godfrey ("Decl.") ¶¶ 7–13, Dkt. 11-1. Although HHS stated in early September that the Grant would not change

2

for fiscal year 2018, *see* Compl. ¶ 19, the agency changed course a few weeks later. By letter on September 26, 2017, HHS informed the Nation that HHS had decided to reduce the Grant to $15,766,194 for fiscal year 2018, based on an enrollment level of 1,396 students in Navajo Head Start, not the previously funded enrollment of 2,068 Head Start students. Decl. Ex. E, Dkt. 11-2 at 14–15. Despite implementing the 12-month remediation plan required by the Head Start Act, the Nation had been unable to achieve or maintain its funded enrollment of 2,068 Head Start students; the reduction by 672 students "represented the average number of vacant slots over a 12 month period." Decl. ¶ 14; *see also* Decl. Ex. A, Dkt. 11-2 at 1 (listing reported enrollment for each month since March 2015).[1] In additional letters on October 5, November 22, and December 4, 2017, HHS reiterated that the Grant would be $15,766,194 for fiscal year 2018. *See* Decl. Exs. F, I, & J, Dkt. 11-2 at 16, 25, 27. The letter of December 4 stated that, if the Navajo Nation submitted a funding application for a higher figure, HHS would "return the application as unfundable and request a revised application for the correct funding and enrollment levels." *Id.* ¶ 22.

The Navajo Nation's funding application for fiscal year 2018 was due on December 1, 2017, but the Nation received a 45-day extension. *Id.* ¶ 23. The application was submitted on January 12, 2018, but it again requested the prior funding level of $23,075,043. *Id.* ¶ 24. HHS refused the Navajo Nation's request. By letter on January 19, 2018, HHS again advised the Navajo Nation that the Grant would be $15,766,194 for fiscal year 2018. Decl. Ex. M, Dkt. 11-2

---

[1] The Grant funds the Nation's Head Start *and* Early Head Start programs, but the reduction appears driven by under-enrollment in Head Start only. The HHS letter of September 26 reduced the Grant amount apportioned to Head Start, as compared to the HHS letter of September 2. Both letters, however, apportioned the same amount to Early Head Start based on the same enrollment: $586,277 for 37 students in Early Head Start. *Compare* Decl. Ex. D, Dkt. 11-2 at 12, *with* Decl. Ex. E, Dkt. 11-2 at 15.

at 32–33. HHS also reiterated that funding was reduced because the Navajo Head Start program was chronically and severely under-enrolled. *See id.*

On February 22, 2018, the Navajo Nation filed its complaint in this action. Dkt. 1. The complaint asserted that (1) HHS—by not promulgating regulations permitting grantees like the Nation to appeal grant reductions in cases of under-enrollment—violated a provision of the Head Start Act that directs HHS to prescribe procedures "to assure that financial assistance . . . may be terminated or reduced" after reasonable notice and an appeal hearing, *see* 42 U.S.C. § 9841(a)(3); Compl. ¶¶ 27–30; and (2) HHS then violated the Administrative Procedure Act by reducing the Navajo Grant without following statutorily mandated procedures, *see* 5 U.S.C. § 706(2); Compl. ¶¶ 31–33.

On the same day, the Nation moved for a preliminary injunction to prevent HHS from reducing the Grant below $23,075,043 pending the disposition of this case. Mot. for Prelim. Inj. at 1, Dkt. 2. The motion was accompanied by an affidavit by the Acting Assistant Superintendent of Navajo Head Start, *see* Dkt. 3-1, and the motion requested a decision before March 1, 2018, when fiscal year 2018 begins. Pl.'s Mem. at 8, Dkt. 2-1.

The Navajo Nation effected service of the complaint and summons on the U.S. Attorney and the U.S. Attorney General on February 9, 2018, *see* Dkt. 6 & 7, and on the HHS Secretary on February 12, 2018, *see* Dkt. 8. But the Navajo Nation did not immediately serve the motion for a preliminary injunction. *See* Plaintiff's Response to Defendant's Notice (Feb. 21, 2018), Dkt. 10 at 1–2 ("Although copies of the motion for preliminary injunction . . . were prepared and were supposed to be included with the summons and complaint, . . . they were inadvertently omitted."). As a result, the government's deadline for opposing the motion was not triggered. *See* Local Civil Rule 65.1(c). On February 21, 2018, the Court ordered the Nation to serve the

motion immediately. *See* Minute Order of February 21, 2018. The Court also set a briefing schedule for the motion in order to facilitate a decision before March 1, 2018. *Id.* Accordingly, HHS filed an opposition brief accompanied by the declaration of the Regional Program Manager who oversees Head Start grants to American Indian programs. Dkt. 11. The Nation then filed a reply brief accompanied by a supplemental affidavit.[2] The Court now resolves the motion.

## II. LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To warrant a preliminary injunction, a plaintiff "must make a clear showing" that (1) he "is likely to succeed on the merits"; (2) he "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) the "balance of equities" tips in his favor; and (4) "an injunction is in the public interest." *Id.* at 20; *League of Women Voters of United States v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016). The last two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The plaintiff "bear[s] the burdens of production and persuasion" when moving for a preliminary injunction. *Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 281 (D.D.C. 2005) (citing *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)).

---

[2] The Court notes in passing that the supplemental affidavit, Dkt. 12-1, is not properly before the Court. Under the local rules, applications for a preliminary injunction "*shall* be supported by *all* affidavits on which the plaintiff intends to rely" and "[s]upplemental affidavits either to the application or the opposition may be filed *only* with permission of the court." Local Civil Rule 65.1(c) (emphasis added). The Navajo Nation did not seek leave of court to file the supplemental affidavit submitted with the reply. Nevertheless, the Court has reviewed the affidavit and finds the Nation's noncompliance "to be of no moment" because the supplemental affidavit "ha[s] not influenced the Court to rule in [the Nation's] favor regarding the irreparable harm factor." *Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 77 n.35 (D.D.C. 2013); *see also Sataki v. Broad. Bd. of Governors*, 733 F. Supp. 2d 1, 9 n.11 (D.D.C. 2010).

"Before the Supreme Court's decision in *Winter*, courts weighed the preliminary injunction factors on a sliding scale, allowing a weak showing on one factor to be overcome by a strong showing on another factor." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 26 (D.D.C. 2016). The D.C. Circuit, however, has "suggested, without deciding, that *Winter* should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring a plaintiff to independently demonstrate both a likelihood of success on the merits and irreparable harm." *Id.* (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392-93 (D.C. Cir. 2011)); *see also Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).

Regardless of whether the sliding scale analysis survives *Winter* in this Circuit, it is clear that failure to show a likelihood of irreparable harm remains, standing alone, sufficient to defeat the motion. "[T]he basis of injunctive relief in the federal courts has always been irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)). As such, a plaintiff must show that "irreparable injury is *likely* in the absence of an injunction," regardless of whether the sliding scale analysis survives *Winter* and regardless of whether the plaintiff satisfies the other three factors. *Winter*, 555 U.S. at 21–22 (emphasis in original); *see Chaplaincy*, 454 F.3d at 297. Therefore, the Court need not resolve whether the sliding scale test is viable after *Winter*. The plaintiff here cannot show likely irreparable harm, so the outcome of this case is the same under either test.

## III. ANALYSIS

Injunctive relief is not warranted because the Navajo Nation has failed to show that it is likely to suffer irreparable harm, which is grounds alone for denying the Nation's motion. *See Chaplaincy*, 454 F.3d at 297.

The D.C. Circuit "has set a high standard for irreparable injury," *Mdewakanton Sioux Indians of Minn. v. Zinke*, 255 F. Supp. 3d 48, 52 (D.D.C. 2017) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)), and a mere possibility is not enough, *see Winter*, 555 U.S. at 22. "First, the injury must be both certain and great; it must be actual and not theoretical. The moving party must show the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm. Second, the injury must be beyond remediation." *Chaplaincy*, 454 F.3d at 297 (quotation marks, citations, and alterations omitted).

The Navajo Nation fails to show that it is likely to suffer irreparable harm from the HHS decision to reduce the Grant from approximately $23.1 million to $15.8 million for fiscal year 2018. According to an affidavit submitted by the Acting Assistant Superintendent for Navajo Head Start, the funding adjustment would cause 672 children and families to lose access to Head Start services. *Id.*; Aff. ¶ 3. The affidavit also states that the Nation will have to lay off at least 147 employees and reduce the hours of 40 other employees, which would "necessitate the closure of a minimum of 34 Head Start facilities." Aff. ¶ 3. According to the Assistant Superintendent's supplemental affidavit, these changes could begin on March 1, 2018: if the funding adjustment occurs on that date, she will begin identifying personnel to be laid off and facilities to be closed, and she "anticipate[s] that layoffs would begin within a couple of weeks thereafter." Supp. Aff. of Dr. Elivra Bitsoi ("Supp. Aff.") ¶ 5, Dkt. 12-1 at 2. Based on these

assertions, the Navajo Nation argues that the "Nation and the children currently served by the Navajo Head Start program will suffer irreparable harm starting on March 1, 2018 if HHS is allowed to reduce the Grant without affording the Nation the appeal rights to which it is entitled." Pl.'s Mem. at 7.

The Court disagrees. First, it appears unlikely that 672 students will lose access to Head Start services due to the HHS decision. The Navajo Nation puts forth 672 as the number of children who will lose access, which is the difference between the number of students for whom Head Start enrollment was previously funded by HHS (2,068) and the Head Start enrollment level on which HHS based its funding decision for fiscal year 2018 (1,396). *See* Compl. ¶ 20; Pl.'s Mem. at 6. HHS reduced the funded enrollment level by 672 because that number "represent[s] the average number of vacant slots over a 12 month period" during which HHS and the Nation sought to remediate under-enrollment. Decl. ¶ 14. Indeed, according to Navajo Nation's self-reported enrollment figures, Head Start enrollment has never exceeded 1,577 in any month since March 2015. Decl. Ex. A, Dkt. 11-2 at 1. And during the months in which HHS decided to adjust funding for fiscal year 2018, reported enrollment was less than the enrollment that HHS ultimately funded: the Navajo Nation reported 1,187 Head Start students in September 2017, 1,280 in October 2017, 1,304 in November 2017, and 1,394 in December 2017. *Id.* Therefore, funded enrollment appears consistent with reported enrollment, and it seems unlikely that there are 672 additional, actual students who would enroll but for HHS's decision.

Second, although the Navajo Nation asserts that it will have to layoff employees and close facilities in the absence of preliminary relief, it is not clear that these alleged harms are sufficiently great, certain, or imminent to warrant injunctive relief. The Nation states that, if a loss of funding occurs on March 1, 2018, it will begin identifying personnel to be laid off and

8

facilities that must be closed, and it "anticipates that layoffs would begin within a couple weeks thereafter." Reply. at 7, Dkt. 12; Supp. Aff. ¶ 5. These alleged harms, therefore, will not arise immediately on March 1 and they can be mitigated by resolving this case on the merits according to an expedited litigation schedule, which the government suggests and which the Court intends to set. *See* Def.'s Notice, Dkt. 9 at 2; Def.'s Opp. at 1 n.1, Dkt. 11; *see also* Order, Dkt. 13. Thus, the alleged harms do not "creat[e] a clear and present need for extraordinary equitable relief to prevent harm." *Pinson v. DOJ*, 273 F. Supp. 3d 1, 13 (D.D.C. 2017) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

Moreover, the Nation's past practice indicates that it does not require immediate access to $23.1 million to provide the same level of Head Start services in fiscal year 2018 as it provided in past years. The Nation regularly fails to spend millions of dollars of its Head Start funds in a budget year. Decl. ¶ 6. In fiscal year 2016, the Navajo Nation obligated only $19.3 million of $25.5 million awarded. *Id.* In fiscal year 2017, the Navajo Nation is expected to obligate only $17.4 million of $23.1 million awarded. *Id.* In those years, the Head Start programs served a similar or higher number of students than expected for fiscal year 2018, which undercuts the Nation's assertion that it will be gravely harmed on March 1 unless the full $23.1 million is made available immediately. *See* Decl. Ex. A, Dkt 11-2 at 1.

Third, even without preliminary relief, HHS will award the Nation $15.8 million for fiscal year 2018. Decl. ¶ 29. The Nation replies that its 2018 grant application "was denied in its entirety," so in fact "the Navajo Nation has no approved Head Start funding whatsoever for Fiscal Year 2018." Supp. Aff. ¶ 6; *see also* Reply at 6. The Navajo Nation may have contributed to this issue by maintaining its request for $23.1 million in its application of January 12, 2018, *see* Pl.'s Mem. at 2, despite extensive notice over the previous months that the

Nation's enrollment did not justify that amount, *see, e.g.*, Decl. Exs. E, F, I, J, & K. Regardless, the Navajo Nation is incorrect because HHS clearly represents that $15.8 million will be awarded: "On March 1, 2018, [HHS] plans to award the Navajo Nation $15,766,194. That entire amount will be available at that time for the Navajo Nation to spend on appropriate Head Start expenditures, subject to grant conditions." Decl. ¶ 29.

In addition to that sum, HHS has committed to restoring $2 million if the Navajo Nation meets certain conditions, the most stringent of which appear to be (1) maintaining enrollment levels of 1,396 Head Start students and (2) creating a wait list of children eligible to fill the approximately 180 to 200 additional seats funded by the restored funding. *See* Decl. ¶ 27; Decl. Ex. M, Dkt. 11-2 at 32–33.

Furthermore, the Navajo Nation can request to carryover its unobligated Head Start funds from fiscal years 2016 and 2017. *See* 45 C.F.R. § 75.309; HHS Grants Policy Statement at II-51 & App. B-2 (Jan. 1, 2007). For fiscal year 2016, the Navajo Nation had approximately $6.3 million in unobligated Head Start funds. Of that amount, the Nation asserts that $5.1 million is unavailable for personnel expenses because HHS has approved its use for projects involving physical infrastructure for the Head Start program. Reply at 7; Supp. Aff. ¶ 11; Supp. Aff. Exs. B & C, Dkt. 12-1 at 11–20. Even so, that leaves at least $1.2 million that the Nation can carryover from fiscal year 2016. HHS "is still waiting for information from the Navajo Nation to process the carryover of these funds, but once the Navajo Nation provides that information those carryover funds would be available to provide Head Start services." Decl. ¶ 6. Also, the Nation could seek to re-apply the other $5.1 million from physical infrastructure to personnel expenses. *See id.*; HHS Grants Policy Statement at II-51.

For fiscal year 2017, HHS anticipates that the Navajo Nation will have approximately $5.7 million in unobligated 2017 funds available for carryover. *Id.* The Nation disputes that estimate, but the Nation does not provide any reasons for its disagreement, nor does it offer an alternative estimate. *See* Reply at 6–7; Supp. Aff. ¶ 10.

Based on these various available funds, the Navajo Nation will have a minimum of $15.8 million immediately for fiscal year 2018, and that sum can be supplemented by up to $2 million in restored funds, $1.2 million in 2016 carryover funds, $5.7 million in 2017 carryover funds, and $5.1 million in re-applied 2016 carryover funds, for a total that exceeds the $23.1 million that the Nation considers sufficient to maintain its Head Start programs. As a result, the Navajo Nation has failed to show that HHS's decision is likely to cause "certain," "great," and "imminen[t]" harm so as to warrant preliminary relief.

Also, the Nation has failed to show that any harm would be *irreparable*, the "key word in th[e] consideration" of irreparable harm. *Chaplaincy*, 454 F.3d at 297 (quotation marks omitted). "It is . . . well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wisconsin Gas Co.*, 758 F.2d at 674. "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Chaplaincy*, 454 F.3d at 297–98 (quotation marks omitted). Without preliminary relief, the Nation will have access to at least $15.8 million instead of $23.1 million on March 1, so the Nation will be unable to immediately draw on $7.3 million of funds that it believes should have been awarded. But to the extent this shortfall represents an unlawful loss, the Nation may be able to recover it through the ordinary course of litigation. Therefore, the alleged economic loss here is not "beyond remediation." *Id.* at 297.

Based on the foregoing analysis, the Navajo Nation has failed to demonstrate that, in the absence of a preliminary injunction, it is likely to suffer irreparable harm before a decision on the merits can be rendered. Without this showing, the Nation is not entitled to preliminary relief. *See Chaplaincy*, 454 F.3d at 297 ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."); *Nat'l Parks Conservation Ass'n v. Semonite*, No. 17-cv-01361, 2017 WL 4776985, at *2, *5 (D.D.C. Oct. 20, 2017) (denying motion for preliminary injunction without considering factors other than likely irreparable harm); *GEO Specialty Chems., Inc. v. Husisian*, 923 F. Supp. 2d 143, 147, 151 (D.D.C. 2013) (same). The Court will therefore deny the Navajo Nation's motion for a preliminary injunction and set an expedited litigation schedule for resolving this case on its merits.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for a Preliminary Injunction, Dkt. 2, is denied. A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

Date: February 28, 2018