**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

THE NAVAJO NATION,

        *Plaintiff,*

   v.

ALEX M. AZAR II, Secretary, United States
Department of Health and Human Services,

        *Defendant.*

Civil Action No. 18-0253 (DLF)

**MEMORANDUM OPINION**

Before the Court is the Defendant's Motion to Dismiss or, in the Alternative, for

Summary Judgment, Dkt. 17, and the Plaintiff's Motion for Summary Judgment, Dkt. 16.  For

the following reasons, the Court will deny the defendant's motion and grant the plaintiff's

motion.

## I. BACKGROUND

Under the Head Start Act, 42 U.S.C. § 9831 *et seq*., the U.S. Department of Health and

Human Services ("HHS") provides grants to tribes that implement Head Start and Early Head

Start programs for young children and their families.  Qualified organizations can receive grants

for up to 80% of Head Start program costs.  42 U.S.C. § 9835(b).  The grants are administered by

a division of HHS, the Administration of Children and Families' Office of Head Start ("OHS").

Dkt. 19 at 13.

The plaintiff, the Navajo Nation, is a federally recognized Indian tribe whose reservation

spans parts of Arizona, New Mexico, and Utah.  Compl. ¶ 11, Dkt.1.  It runs Head Start and

Early Head Start programs to provide education services to its young members and residents and

their families.  Dkt. 19 at 13.  The programs are funded primarily by a federal grant, No.

90C19889 ("the Grant"), which is at the center of this case.  *Id.*  The Grant's budgetary period, or

fiscal year, starts on March 1 each year and runs through February of the next year.  *Id.*  The

Navajo Nation must submit an annual renewal application for the Grant, which is due on

December 1 before the new fiscal year starts.  Compl. ¶ 18.  In recent fiscal years, the Navajo

Nation has received $23,075,043 annually pursuant to the Grant.  Dkt. 19 at 13.

Under the Head Start Act, however, grants are not static from year to year.  Section

641a(h) of the Act provides specific procedures for adjusting grants to Head Start programs that

suffer from "chronic underenrollment."  42 U.S.C. § 9836a(h).  Grantees must self-report

enrollment each month, *id.* § 9836a(h)(2), and HHS must conduct a semiannual review to

determine which grantees have been under-enrolled for four consecutive months, *id.*

§ 9836a(h)(3).  HHS and each under-enrolled grantee must then develop a plan and timetable for

remediating under-enrollment, and the grantee "shall immediately implement the plan."  *Id.*

§ 9836a(h)(3), (4).  If the grantee does not reach at least 97% enrollment within twelve months,

HHS may designate the grantee as chronically under-enrolled and "recapture, withhold, or

reduce" the base grant by a percentage calculated as the difference between funded and actual

enrollment.  *Id.* § 9836a(h)(5)(A).  Also, HHS may waive or decrease the adjustment in certain

circumstances.  *Id.* § 9836a(h)(5)(B).  If HHS adjusts funding for an Indian Head Start program,

HHS must redistribute the resulting funds to other Indian Head Start programs by the end of the

following fiscal year.  *Id.* § 9836a(h)(6).

The Navajo Head Start program failed to reach its funded enrollment in many recent

years in the 2000s and 2010s.  *See* Dkt. 11-1 at 2–3.  Due to under-enrollment, HHS decided to

reduce the Navajo Nation's funding in 2011.  *See* Dkt. 18-1 at 4, 7; Unedited Hr'g Tr. at 3.[1]  At

that time, the Nation filed an appeal before the HHS Departmental Appeals Board ("DAB"), but

the Nation and HHS ultimately reached a settlement agreement through a tribal consultation

process, so they jointly moved the Departmental Appeals to dismiss the appeal.  *See* Dkt. 18-1 at

1–7; Unedited Hr'g Tr. at 3.  Even so, under-enrollment continued to be a problem.  For

example, the Navajo Nation did not meet Head Start funded enrollment in every month from

March 2015 to January 2018.  During that time period, funded Head Start enrollment was 2,068

students, but the Nation's self-reported student numbers generally ranged from approximately

1,000 to 1,600 students.  *See* Dkt. 11-2 at 1.

 Due to the continuing under-enrollment problems, HHS and the Navajo Nation began

discussing remediation in 2015.  Dkt. 11-1 at 4.  Then, throughout 2016 and 2017, they

implemented a detailed remediation plan, as required by Section 641a(h) of the Head Start Act.

Dkt. 11-2 at 2-3.  The remediation plan involved extensive coordination and communication

between the Nation and HHS, including meetings, calls, on-site visits, and training.  *See id.* at 4–

10.

 Remediation, however, was unsuccessful.  By letter on September 26, 2017, HHS

informed the Nation that HHS found Navajo Head Start to be "chronically underenrolled" and

HHS reduced the Navajo Grant to $15,766,194 for fiscal year 2018, which runs from March 1,

2018 to February 28, 2019.  Dkt. 11-2 at 14–15.  This reduction was based on an enrollment

level of 1,396 students in Navajo Head Start, not the previously funded enrollment of 2,068 Head

Start students.  Dkt. 11-2 at 12–15.  The 672-student change "represented the average number of

---

[1] Once the final transcript is published, the Court will update transcript citations in accordance
with the final transcript instead of the unedited transcript.

vacant slots over a 12 month period." Dkt. 11-1 at 6; *see also* Dkt. 11-2 at 1 (listing enrollment

reported by the Navajo Nation for each month from March 2015 to January 2018).[2]  Despite

notifying the Navajo Nation that funding had been reduced, the HHS letter also provided the

Navajo Nation with the opportunity to present certain countervailing considerations within 30

days.  *See* Dkt. 11-2 at 15 ("If there are significant causes of underenrollment that OHS was not

made aware of over the 12 month period, please inform your regional office within 30 days of

the delivery of this notice.").

      In additional letters on October 5, November 22, and December 4, 2017, HHS reiterated

the reduced funding level.  Dkt. 19 at 13–14.  Even so, on January 12, 2018, the Navajo Nation

submitted a funding application for fiscal year 2018 seeking $23,075,043.  *Id.* at 14.  By letter

one week later, HHS again advised the Navajo Nation that the Grant would be the reduced

amount for the reduced funded enrollment level.  *Id.*  In the same letter, however, HHS

committed to restoring $2 million if the Nation meets certain conditions, the most stringent of

which appear to be (1) maintaining enrollment levels of only 1,396 Head Start students and (2)

creating a waitlist of children eligible to fill the approximately 180 to 200 additional seats to be

supported by the restored funding.  *See* Dkt. 11-2 at 32–33.

      On February 2, 2018, the Navajo Nation filed its complaint in this action.  Dkt. 1.  On the

same day, the Nation moved for a preliminary injunction, Dkt. 2, and requested a decision before

---

[2] The Grant funds the Nation's Head Start *and* Early Head Start programs, but the reduction
appears driven by under-enrollment in Head Start only.  The HHS letter of September 26 reduced
the Grant amount apportioned to Head Start, but did not change the amount apportioned to Early
Head Start nor the enrollment level for Early Head Start ($586,277 for 37 students in Early Head
Start).  *Compare* Dkt. 11-2 at 12, *with id.* at 15.

the end of the month, *see* Dkt. 2-1 at 8.[3]  On February 28, 2018, the Court denied the motion for

a preliminary injunction and set an expedited schedule for resolving the case on its merits.  *See*

Dkt. 13; Dkt. 14.

HHS now moves for dismissal under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of

Civil Procedure; in the alternative, HHS moves for summary judgment under Rule 56.  Dkt. 17.

In turn, the Navajo Nation moves for summary judgment, arguing that HHS violated the Head

Start Act and the Administrative Procedure Act by reducing the Nation's funding without

providing an appeal and hearing required by the Head Start Act.  Dkt. 16 at 1.

## II.  LEGAL STANDARD

Under Rule 12(b)(1), a party may move to dismiss a claim over which the court lacks

subject-matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  A motion for dismissal under Rule 12(b)(1)

"presents a threshold challenge to the court's jurisdiction."  *Haase v. Sessions*, 835 F.2d 902, 906

(D.C. Cir. 1987).  Federal district courts are courts of limited jurisdiction, and it is "presumed

that a cause lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S.

375, 377 (1994).  Thus, the plaintiff bears the burden of establishing jurisdiction by a

preponderance of the evidence.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

"When ruling on a Rule 12(b)(1) motion, the court must treat the plaintiff's factual

allegations as true and afford the plaintiff the benefit of all inferences that can be derived from

the facts alleged."  *Jeong Seon Han v. Lynch*, 223 F. Supp. 3d 95, 103 (D.D.C. 2016) (quotation

---

[3] The Navajo Nation effected service of the complaint and summons on the U.S. Attorney and the U.S. Attorney General on February 9, 2018, *see* Dkt. 6 & 7, and on the HHS Secretary on February 12, 2018, *see* Dkt. 8.  But the Nation did not immediately serve the motion for a preliminary injunction.  Dkt. 10 at 1–2.  As a result, the defendant's deadline for opposing the motion was not triggered.  *See* Local Civil Rule 65.1(c).  On February 21, 2018, the Court ordered the Nation to serve the motion immediately, and the Court set an expedited briefing schedule for resolving the preliminary injunction motion.

marks and citation omitted).  Those factual allegations, however, receive "closer scrutiny" than

they would in the Rule 12(b)(6) context.  *Id.*  Also, unlike when evaluating a Rule 12(b)(6)

motion, a court may consider documents outside the pleadings to evaluate whether it has

jurisdiction.  *See Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  If

the court determines that it lacks jurisdiction, the court must dismiss the claim or action.  Fed. R.

Civ. P. 12(b)(1), 12(h)(3).

Under Rule 12(b)(6), a party may move to dismiss for failure to state a claim upon which

relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a complaint

"must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 570 (2007)).  To state a facially plausible claim, the plaintiff must plead

"factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged."  *Id.*  A complaint alleging "facts [that] are 'merely consistent with' a

defendant's liability . . . 'stops short of the line between possibility and plausibility of entitlement

to relief.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

When evaluating a Rule 12(b)(6) motion, the court "must construe the complaint in favor

of the plaintiff, who must be granted the benefit of all inferences that can be derived from the

facts alleged."  *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quotation marks

omitted).  Conclusory allegations, however, are not entitled to an assumption of truth, and even

allegations pleaded with factual support need only be accepted insofar as "they plausibly give

rise to an entitlement to relief."  *Iqbal*, 556 U.S. at 679.  Along with the allegations within the

four corners of the complaint, the court can consider "any documents either attached to or

6

incorporated in the complaint and matters of which [it] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

Finally, under Rule 56, a court grants summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). A "material" fact is one with potential to change the substantive outcome of the litigation. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895. A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.

In an Administrative Procedure Act case, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006). In other words, "the entire case . . . is a question of law" and the district court "sits as an appellate tribunal." *Am. Biosci., Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (quotation marks and footnote omitted). Where a plaintiff challenges an agency action that interprets a statute the agency administers, review is governed by the two-step *Chevron* doctrine. At Step One, a court must determine "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 842, 843–44 (1984). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. In other words, if the "search for the plain meaning of the statute yields a clear result, then Congress has expressed its intention as to the question, and deference is

not appropriate." *Eagle Broad. Grp., Ltd. v. FCC*, 563 F.3d 543, 552 (D.C. Cir. 2009). But if the Court concludes that "the statute is either silent or ambiguous with respect to the specific issue," the Court must reach Step Two, which asks whether the agency action "is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.

## III.  ANALYSIS

### A.  Defendant's Motion to Dismiss

The Court begins by briefly addressing the grounds upon which HHS moves for dismissal under Rules 12(b)(1) and 12(b)(6). First, this Court has federal-question jurisdiction under 28 U.S.C. § 1331, which grants the district court original jurisdiction over civil actions arising under federal law and "thereby confers jurisdiction on federal courts to review agency action." *Oryszak v. Sullivan*, 576 F.3d 522, 524–25 (D.C. Cir. 2009) (alteration and quotation omitted). A case arises under federal law if "a well-pleaded complaint establishes . . . the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Bender v. Jordan*, 623 F.3d 1128, 1130 (D.C. Cir. 2010) (quotation omitted). Here, the Navajo Nation's right to relief hinges on what the Head Start Act requires of HHS. Therefore, this Court has jurisdiction.

Second, the complaint states a claim for relief. HHS argues that the Head Start Act alone does not provide a cause of action or authorize judicial review, *see* Dkt. 17 at 9–10, but that does not mean the complaint fails. Even though the Head Start Act does not provide a specific private cause of action, the Administrative Procedure Act provides a cause of action to those aggrieved by agency action, *see* 5 U.S.C. §§ 702, 704, and the Administrative Procedure Act "requires federal courts to set aside federal agency action that is 'not in accordance with law,' 5 U.S.C. § 706(2)(A)—which means, of course, any law," including the Head Start Act. *FCC v.*

*NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003).  As a result, the complaint sufficiently alleges a violation of the Administrative Procedure Act, which turns on whether the Head Start Act was violated.  Therefore, the Court will deny HHS's motion to dismiss on this ground.

HHS also argues that the complaint fails to allege that HHS's notice-and-comment rulemaking was deficient under Section 706(2)(D) of the Administrative Procedure Act.  *See* Dkt. 17 at 12–13.  But that argument is beside the point.  The Navajo Nation does not assert that HHS failed to follow the Administrative Procedure Act's notice-and-comment rulemaking procedures when HHS promulgated its regulations, such as they are, for appeals and hearings under 42 U.S.C. § 9841(a)(3).  For example, the Nation does not assert that HHS failed to solicit comments.  Rather, the Nation alleges that the Head Start Act, *not* the Administrative Procedure Act, mandates certain procedures when funding is reduced due to chronic under-enrollment.  According to the Nation, HHS—by not providing the procedures mandated by the Head Start Act—allegedly failed to "observ[e] procedures required by law."  5 U.S.C. § 706(2)(D); Compl. ¶ 33.

HHS counters that Section 706(2)(D) applies only to procedures mandated by the Administrative Procedure Act, not the Head Start Act, *see* Dkt. 21 at 2, an argument against which the Navajo Nation responds vigorously, *see* Unedited Hr'g Tr. at 13–16.  Regardless, *Sections 706(2)(A) and (C)* permit review of the issue in this case:  whether HHS's action was "in accordance with law," *i.e.*, with the Head Start Act.  5 U.S.C. § 706(2)(A), (C).  HHS concedes as much.  *See* Unedited Hr'g Tr. at 18 ("[I]t doesn't matter because the Court is still going to address whether or not the agency's action was lawful under whichever provision of the APA, and I don't think the standard is going to change.").  Because Sections 706(2)(A) and (C)

permit the Court to address this issue, the Court need not wade into the parties' debate about whether Section 706(2)(D) provides an alternate avenue for addressing the same issue.[4]

Accordingly, the Court will deny dismissal under Rules 12(b)(1) and 12(b)(6).  To the extent that HHS's motion raises other arguments, the motion presents material outside the pleadings.  *See, e.g.*, Dkt. 17 at 6, 17, 19; Dkt. 19 at 13–14.  Therefore, it must be treated as a cross-motion for summary judgment, to which the Court now turns.  *See* Fed. R. Civ. P. 12(d).

### B.    Cross-Motions for Summary Judgment

This case turns on whether HHS must provide for an appeal and hearing before adjusting funding due to under-enrollment.  Under Section 641a(h) of the Head Start Act, HHS "may . . . . recapture, withhold, or reduce the base grant" of "chronically underenrolled" programs.  42 U.S.C. § 9836a(h)(5)(A).  Section 646 of the Head Start Act provides for an appeal and hearing in certain situations, including when financial assistance is "reduced":

> **(a) Notice requirements; suspension or termination of assistance stayed pending hearing; mediation**
>
> The Secretary shall prescribe . . .

---

[4] The parties may also disagree about whether jurisdiction and relief are appropriate under the Mandamus Act, 28 U.S.C. § 1361, but the Court need not reach those questions either.  The writ of mandamus is available "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  *Id.*  Mandamus relief is available only if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff."  *In re Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005) (quotation omitted).

An adequate alternative remedy is available to the Navajo Nation because the Administrative Procedure Act empowers district courts to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  Therefore, the Court does not address whether mandamus is available.  *See Action Alliance of Senior Citizens v. Leavitt*, 483 F.3d 852, 858 (D.C. Cir. 2007) (noting that "mandamus's invariable condition" is "the absence of an alternative remedy"); *Hamandi v. Chertoff*, 550 F. Supp. 2d 46, 53 (D.D.C. 2008) ("Because the Court finds that it has jurisdiction . . . pursuant to 28 U.S.C. § 1331 and the APA, it need not reach the question of whether mandamus is available . . . .").

      (3) procedures to assure that financial assistance under this subchapter may be terminated or *reduced*, and an application for refunding may be denied, after the recipient has been afforded reasonable notice and opportunity for a full and fair hearing, including—

          (A) a right to file a notice of appeal of a decision not later than 30 days after notice of the decision from the Secretary; and

          (B) access to a full and fair hearing of the appeal, not later than 120 days after receipt by the Secretary of the notice of appeal

42 U.S.C. § 9841(a) (emphasis added).  Section 646 uses "shall," so it is mandatory.  *Id.*; *see Shapiro v. McManus*, 136 S. Ct. 450, 454 (2015).  And it applies to HHS actions to terminate or reduce "financial assistance under this subchapter," *i.e.*, Subchapter II of Chapter 105 of Title 42, which includes Section 641a(h).  Because the Court concludes that a funding adjustment for chronic under-enrollment under Section 641a(h) is a "reduction" within the meaning of Section 646, such funding adjustments merit an appeal and a full and fair hearing under Section 646.  42 U.S.C. § 9841(a).

      To "reduce" means "to diminish in size, amount, extent, or number," and a "reduction" is "the act or process of reducing."  Merriam-Webster's Collegiate Dictionary at 1044 (11th ed. 2009); Webster's Third New International Dictionary at 1905 (1981).  That definition encompasses funding adjustments for chronic under-enrollment such as the adjustment in this case, which diminished the Nation's funding from approximately $23 million to $15 million.  Dkt. 19 at 13.  Furthermore, HHS clearly labeled the funding adjustment as a "reduction" under Section 641a(h).[5]

---

[5] *See* HHS Letter of Sept. 26, 2017, Dkt. 11-2 at 14 ("[I]t is the decision of OHS to reduce your federal Head Start program funding levels."); HHS Letter of Nov. 22, 2017, Dkt. 11-2 at 25 (OHS's "decision to reduce Navajo Head Start's funding and funded enrollment;" "decision to reduce funded enrollment and funding"); HHS Letter of Dec. 4, 2017, Dkt. 11-2 at 27 (OHS's "decision to reduce funding and enrollment;" "reduced funding"); HHS Letter of Jan. 19, 2018,

Perhaps most tellingly, however, the Head Start Act itself explicitly deems funding adjustments due to chronic under-enrollment to be "reductions." The provision governing such adjustments, Section 641a(h), is titled "*Reduction* of grants and redistribution of funds in cases of underenrollment." 42 U.S.C. § 9836a(h) (emphasis added). Section 641a(h) authorizes HHS to adjust funding due to chronic under-enrollment by permitting the agency to "recapture, withhold, or *reduce* the base grant." *Id.* § 9836a(h)(5)(A)(ii) (emphasis added). Once funding is adjusted, Section 641a(h) provides for the "Waiver or limitation of *reductions*" in certain circumstances. 42 U.S.C. § 9836a(h)(5)(B) (emphasis added). The Head Start Act thus makes clear that under-enrollment adjustments are "reductions." And under the "usual presumption that identical words used in different parts of the same statute carry the same meaning," *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1723 (2017); *see also NetCoalition v. SEC*, 715 F.3d 342, 350 (D.C. Cir. 2013), under-enrollment "reductions" are covered by Section 646's requirements for an appeal and hearing in cases of "reductions." Therefore, Section 646 requires that HHS provide for an appeal and hearing before adjusting funding due to chronic under-enrollment under Section 641a(h).[6]

---

Dkt. 11-2 at 32 ("FY 18 funding is a reduction from FY 17 funding resulting from chronic and severe underenrollment over a decade.").

[6] HHS advocates the opposite conclusion by relying in part on *Ohio Head Start Association, Inc. v. HHS*, 873 F. Supp. 2d 335 (D.D.C. 2012), which concluded that Head Start grantees determined to be "low-performing" under the Designation Renewal System are not entitled to an appeal. *Ohio Head Start*, however, is irrelevant here. The case assessed a constitutional claim, and it ultimately decided that the due process clause does not require an appeal when HHS determines that a grantee is "low-performing." In contrast, the Navajo Nation asserts only statutory claims. And the specific statutory issue here—the extent of appeal and hearing rights under Section 646(a)(3)—was not addressed by *Ohio Head Start*. Thus, *Ohio Head Start* does not bear on this case.

Moreover, although the presumption of consistent usage can be rebutted by context, *see UARG v. EPA*, 134 S.Ct. 2427, 2441–42 (2014), the context of the Head Start Act gives no reason to think that "reduce" in Section 646 means something different from "reduce" in Section 641a(h).  It is true that, as HHS points out, the Act not only authorizes HHS to "reduce" funding due to under-enrollment, but also authorizes HHS to "withhold" or "recapture" funding.  42 § 9836a(h)(5)(A)(ii).  According to HHS, Section 646's appeal and hearing requirements do not mention (and thus does not apply to) a "withholding" or a "recapture," so the requirement should not extend to their functional analogue:  "reductions."  But these points steer the Court in the opposite direction.  If anything, the fact that "recapture, withhold, and reduce" are similar actions to decrease financial assistance under a provision titled "Reduction of grants" indicates that *all three* trigger appeal and hearing rights under Section 646, not that *none* of them do.  Otherwise, the appeal and hearing rights would hinge on the technical label attached to similar actions to decrease financial assistance.  Therefore, the Court reads Section 646 to require an appeal and hearing for all funding adjustments for chronic under-enrollment under Section 641a(h), regardless of whether the adjustments are styled reductions, withholdings, or recaptures.

Contrary to HHS's assertions, this reading does not violate the anti-surplusage canon. Even if the three actions are functional analogues, that does not mean the actions are entirely identical.  The Act might reasonably specify similar actions in Section 641a(h), and then—in a different section of the Act—use the umbrella term "reductions" to cover all three actions for purposes of appeal and hearing rights, just as Section 641a(h) identifies all three actions under the title "reductions."  In other words, treating all three actions as "reductions" within the

meaning of Section 646 does not make surplusage of the terms "recapture" and "withhold" within Section 641a(h).[7]

Further examining the Head Start Act's context, the detailed procedures for dealing with under-enrollment under Section 641a(h) do not bar the Act from also contemplating an appeal and hearing under Section 646 in cases of under-enrollment.  Struggling Head Start programs have the opportunity to go through a lengthy remediation process—with extensive notice and interaction with HHS—before being designated as chronically under-enrolled and losing funding.  *See* 42 U.S.C. § 9836a(h)(3), (4), (5).  But highly prescribed procedures *before* designation do not foreclose appeal and hearing procedures *afterwards*.  As a result, Sections 641a(h) and 646 do not conflict, and both can be given their full effect.

This is especially true because the designation procedures are not automatic; thus, contrary to HHS's arguments that the procedures leave nothing to appeal, the procedures are consistent with appeals on various grounds.  If a program's remediation plan fails, HHS "may"— not "shall"—designate the program as chronically under-enrolled and reduce funding.  42 U.S.C. § 9836a(h)(5)(A).  "The word 'may' customarily connotes discretion."  *Jama v. ICE*, 543 U.S. 335, 346 (2005); *see also* Unedited Hr'g Tr. at 19–20 (acknowledging that the designation is discretionary).  Also, the Act provides that HHS may exercise discretion to waive or limit reductions in certain circumstances, which is also consistent with appeal rights.  *See id.* § 9836a(h)(5)(B) ("The Secretary may, as appropriate, waive or reduce the percentage

---

[7] The Court also notes that the anti-surplusage canon should be applied with caution because "[s]ometimes drafters *do* repeat themselves and *do* include words that add nothing of substance, either out of a flawed sense of style or to engage in the ill-conceived but lamentably common belt-and-suspenders approach."  *United States v. Bronstein*, 849 F.3d 1101, 1110 (D.C. Cir. 2017) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law* 176–77 (2012)); *see also Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004); Abbe R. Gluck & Lisa Schultz Bressman, *Statutory Interpretation from the Inside: Part I*, 65 Stan. L. Rev. 901, 933–36 (2013).

recapturing, withholding, or reduction otherwise required by [Section 641a(h)(5)(A)], if, after the implementation of the [remediation plan], the Secretary finds that [certain circumstances exist].").  This discretion means that the Act's chronic under-enrollment procedures are not so highly prescribed as to leave nothing to appeal.  And, even if limited discretion were involved, the Act could reasonably provide an appeal to ensure that a "second set of eyes" reviews the decision.

In sum, the context of the Head Start Act does not rebut the presumption of consistent usage.  Rather, the context confirms that a funding adjustment for chronic under-enrollment under Section 641a(h) is clearly a reduction that merits an appeal and a hearing under Section 646.  The Head Start Act thus "'unambiguously foreclose[s] the agency's statutory interpretation' . . . by prescribing a precise course of conduct other than the one chosen by the agency."  *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 659 (D.C. Cir. 2011) (quoting *Catawba Cnty v. EPA*, 571 F.3d 20, 35 (D.C. Cir. 2009)).  Under *Chevron* Step One, "'[t]hat is the end of the matter," so the Court does not address whether HHS's interpretations are sufficiently reasonable to merit deference under Step Two.  *Id.* at 661.

Given that the Head Start Act requires the opportunity for an appeal and a hearing in this case, it is clear that HHS has not met this requirement.  HHS has promulgated regulations that prescribe appeal and hearing procedures for certain actions that reduce funding, but the regulations do not apply to reductions based on chronic under-enrollment, *see* 45 C.F.R. § 1304.1(b), and HHS has not used less formal measures to establish appeal and hearing procedures for reductions based on chronic under-enrollment.

In addition, HHS did not provide for an individualized appeal and hearing before adjusting funding in the Navajo Nation's particular case.  HHS suggests briefly that its

interactions with the Nation *did* in fact constitute the appeal and hearing required by Section 646(a)(3).  *See, e.g.*, Unedited Hr'g Tr. at 19, 32.  It is true that, in the letter reducing the Nation's funding, HHS added:  "If there are significant causes of underenrollment that [HHS] was not made aware of over the 12 month period, please inform your regional office within 30 days of the delivery of this notice."  Dkt. 11-2 at 16.  In response to this invitation, the Nation submitted a letter regarding its program's enrollment challenges, *see* Dkt. 11-2 at 18, but HHS ultimately decided against changing the reduction, *see* Dkt. 11-2 at 25.

Without the benefit of briefing on this issue, the Court does not express a comprehensive view on the full meaning of an "appeal" and "hearing" in Section 646(a)(3), but it is clear that these HHS actions do not qualify.  The reduction letter did not clearly convey appeal rights:  it did not use the word "appeal," nor did the letter state that additional information could change HHS's initial decision.  And to the extent that the reduction letter *did* suggest that HHS might reconsider its initial decision, that reconsideration would not be a general appeal; instead, it would be limited to "significant causes of underenrollment" of which HHS was previously unaware.  Also, even if the letter did provide for an appeal, it made no mention of a hearing.  Finally, it appears from the record before the Court that the same HHS official—the OHS Acting Director—reduced the Nation's funding and later decided against changing that reduction based on the Nation's enrollment challenges.  *Compare* Dkt. 11-2 at 16 (reduction letter signed by OHS Acting Director Ann Linehan), *with* Dkt. 11-2 at 26 (letter deciding against changing the reduction, also signed by OHS Acting Director Ann Linehan).  It would be an odd "appeal" that asks the initial decision-maker to also sit as the appellate body reviewing the initial decision.[8]

---

[8] At the motion hearing, the defendant's counsel suggested that a higher HHS official, the acting assistant secretary, actually "approved" the decision against changing the reduction.  *See*

Therefore, HHS's actions to date have not provided the appeal and hearing rights required by Section 646(a)(3).

###    C.      Relief

For the foregoing reasons, the Court will grant the relief requested by the Navajo Nation. *See* Dkt. 16 at 7; Dkt. 16-1 at 1; Dkt. 20 at 4.  In particular, the Court will (1) declare that HHS's reduction of the Navajo Nation's Head Start funding for fiscal year 2018 was not in accordance with the requirements of Section 646(a)(3) of the Head Start Act; (2) set aside the reduction of the funding; and (3) declare that HHS cannot reduce the Navajo Nation's Head Start funding under the Grant unless and until the Navajo Nation is afforded the notice, appeal, and hearing rights to which it is entitled under Section 646(a)(3).

The Court takes no position on the manner in which HHS must afford the Navajo Nation its rights under Section 646(a)(3).  The parties debate whether Section 646(a)(3) requires HHS to "prescribe [the appeal and hearing] procedures" via notice-and-comment rulemaking, via less formal processes, or via an *ad hoc* procedure specific to the Navajo Nation.  Regardless, "it is the prerogative of the agency to decide in the first instance how best to provide relief."  *Bennett v. Donovan*, 703 F.3d 582, 589 (D.C. Cir. 2013).  "Only in rare cases . . . does the court direct the agency how to resolve a problem," and the Nation does not request that the Court do so here, so the Court takes no position on the manner in which HHS must afford the Nation its rights under Section 646(a)(3).  *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1111 n.6 (D.C. Cir. 2014).

---

Unedited Hr'g Tr. at 19 ("I will concede that . . . the acting assistant secretary didn't actually sign the letter that resolved the request for reconsideration, but he was in meetings, and my understanding is he approved it.").  But that is insufficient to overcome the record before the Court, particularly the two letters signed by the OHS Acting Director.

Finally, the Court declines the Navajo Nation's request that the Court retain jurisdiction over this dispute. "When a district court reverses agency action and determines that the agency acted unlawfully, ordinarily the appropriate course is simply to identify a legal error and then remand to the agency, because the role of the district court in such situations is to act as an appellate tribunal." *Bennett*, 703 F.3d at 589. The Court sees no reason to depart from the ordinary course, nor does the Court have any reason to think that HHS will not proceed in accordance with this opinion. Therefore, the Court will not retain jurisdiction.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment, Dkt. 17, is denied, and Plaintiff's Motion for Summary Judgment, Dkt. 16, is granted. A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

Date:  March 27, 2018